2026 UT App 107

## THE UTAH COURT OF APPEALS

AMERICAN FORK CITY,
Appellee,
*v.*
BRANDON S. BARBOUR,
Appellant.

Opinion
No. 20240929-CA
Filed July 16, 2026

Fourth District Court, American Fork Department
The Honorable Denise Porter
No. 235101775

Emily Adams and Rachel Phillips Ainscough,
Attorneys for Appellant

James Hansen, Cherylyn M. Egner,
Melissa K. Mellor, and Jesse R. Drury,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1     Brandon Barbour was pulled over in May 2023 in American Fork, Utah, and charged with driving under the influence, driving on a suspended license, speeding, and improper lane travel. He was convicted on all counts apart from the speeding charge. On appeal, Barbour asserts two claims of ineffective assistance of counsel, arguing that his lawyer (Counsel) should have (1) moved to suppress the result of his breath test because he had been biting his fingernails during the minutes leading up to the test and (2) objected to comments made by the prosecutor related to the breath test or otherwise played video of the nail biting for the jury. We conclude that Barbour was

deprived of effective assistance because a motion to suppress the breath test would likely have been successful and because Counsel's failure to make such a motion prejudiced Barbour's defense. We therefore vacate the DUI conviction and remand the matter for a new trial.

## BACKGROUND[1]

¶2 On May 7, 2023, Barbour was driving in American Fork when he was spotted by two officers. One of the officers (Deputy) believed, based on his "training and experience," that Barbour was speeding. The officers started following Barbour and pulled him over after his car briefly crossed the median. Deputy ran Barbour's information through the police database and learned that his license had been suspended and that a warrant had been issued for his arrest based on his failure to appear in court on multiple traffic violations. Deputy was discussing next steps with the other officer when Barbour got out of his car. By this time, backup had arrived, and the officers handcuffed Barbour and placed him into one of the squad cars. In the process, one of the officers smelled alcohol on Barbour's breath. An officer then asked Barbour if he had been drinking that night. He answered that he had consumed "a shot and a beer."

¶3 The officers then drove Barbour to the American Fork police station and conducted field sobriety tests (FSTs), during which Barbour showed "clues of impairment." At the station, Barbour was asked again how many drinks he had consumed that night. This time, Barbour said that he had "two shots of tequila and two beers." The officers also tried to administer a breath test

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (cleaned up).

using an Intoxilyzer machine but were unable to do so in American Fork because the machine wasn't working properly. For this reason, they took Barbour to the Pleasant Grove police station, which had a working Intoxilyzer, to conduct the breath test. Deputy observed Barbour for more than fifteen minutes before the test, which ultimately revealed that Barbour had a blood alcohol concentration (BAC) of .11. American Fork City (the City) then charged Barbour with DUI, driving on a suspended license, speeding, and improper lane travel.

¶4 After Barbour was charged, Counsel entered an appearance and filed a request for discovery. The City produced, among other evidence, bodycam footage capturing the fifteen minutes leading up to the breath test and the test itself. The footage showed Barbour biting his fingernails, more or less continuously, for more than two minutes during the *Baker* observation period and not stopping until less than a minute before the officers administered the breath test.[2] At a pretrial

---

2. In Utah, the fifteen-minute period immediately preceding a breath test is often referred to as the *Baker* period, which takes its name from a 1960 Washington Supreme Court case. There, the court adopted a rule requiring a party seeking to introduce the results of a breath test to make a prima facie showing that, among other things, the subject "had nothing in his mouth at the time of the test and that he had taken no food or drink within fifteen minutes prior to taking the test." *State v. Baker*, 355 P.2d 806, 810 (Wash. 1960) (en banc). In 1977, Justice Maughan advocated in dissent for the adoption of something resembling *Baker*'s foundational requirements in Utah law. *See In re Oaks*, 571 P.2d 1364, 1367–68 (Utah 1977) (Maughan, J., dissenting). Although the timing is not entirely clear, Justice Maughan's position was adopted no later than 2004. *See State v. Vialpando*, 2004 UT App 95, ¶ 14, 89 P.3d 209 (expressly adopting *Baker* and suggesting that

(continued…)

hearing, Counsel stated that he "anticipat[ed] filing a motion to suppress." However, Counsel didn't state the basis for the potential motion, and he never filed it.[3]

¶5 The case proceeded to a jury trial. The City called Deputy and another officer who had been on the scene, and they testified to many of the facts recited above. Deputy also testified that *Baker* required him to be in the same room as Barbour for fifteen minutes to ensure that nothing went in or out of Barbour's mouth. However, Deputy did not specifically state that he complied with *Baker* when he administered the breath test. And on cross-examination, he could "not recall" whether Barbour "put his hands to his mouth" during the observation period prior to the Intoxilyzer test. Deputy also acknowledged that he had not smelled alcohol on Barbour's breath or otherwise "observe[d] any indication of impairment," such as red eyes, during the initial traffic stop encounter.[4] On redirect, however, Deputy stated that he was "confident, based on [his] training, that the Intoxilyzer was

---

our supreme court had done so in 1987 in *Salt Lake City v. Womack*, 747 P.2d 1039 (Utah 1987)).

3. Prior to trial, Barbour asked the district court to appoint a new lawyer for him because he believed that Counsel was "incompeten[t]." At a hearing on the matter, Barbour asserted that Counsel had told him that any "[m]otions to suppress and stuff like that" would have been futile.

4. Deputy speculated that he may not have been able to smell any alcohol during the traffic stop because Barbour had been smoking a cigarette. Based on our review of Deputy's bodycam footage, Barbour had started smoking a cigarette while Deputy was running Barbour's information through the police system after the initial encounter. However, Barbour did not appear to be smoking during that initial encounter.

properly administered." After the officers testified, the City rested.

¶6    Barbour elected to testify in his own defense. He stated that he had been biting his nails during the pretest observation period. However, Counsel did not play the portion of the bodycam video for the jury that corroborated this testimony. Barbour also claimed that he had to use the bathroom and "had a hard time sitting still and focusing" during the FSTs because he "was trying to focus on not peeing [himself]." After Barbour testified, the defense rested and the case proceeded to closing arguments.

¶7    In his closing argument, the prosecutor made clear that the City's theory on the DUI charge was based on Barbour being over the legal BAC limit. This required the City to prove that Barbour had either "operate[d]" or been in "actual physical control of a vehicle" and had "a blood or breath alcohol concentration of .05 grams or greater" in his body. *See* Utah Code § 41-6a-502(1)(a). The prosecutor also claimed that the *Baker* issue "should have been—or was determined" before trial. And he suggested that, even if the issue were up for debate, Deputy had complied with *Baker* because he "observe[d]" Barbour during the observation period.

¶8    In response to the prosecutor's point about *Baker*, Counsel noted that Deputy could not recall whether Barbour placed his fingers in his mouth during the pretest observation period. Counsel also stated that Barbour was a painter by trade and may have had "acetone on his fingers," which Counsel suggested could have been at least partially responsible for Barbour's elevated BAC level.[5]

---

5. Counsel's statement, however, was not evidence. *See, e.g., State ex rel. Div. of Forestry, Fire & State Lands v. Six Mile Ranch Co.*, 2006 UT App 104, ¶ 31 n.10, 132 P.3d 687 ("[A]rgument of counsel is

(continued…)

¶9    In rebuttal, the prosecutor claimed Deputy had testified that he complied with *Baker* when he administered the breath test. The prosecutor also asserted that the rule requires only that an officer (1) "pay attention and make sure [the defendant is] not burping, vomiting, [or] doing anything like that" and (2) check the defendant "for chewing gum or dentures, things like that, just to ensure accuracy in the test." He claimed further that the rule does not require that an officer "pick up on every little brush of the face or anything like that."

¶10    The case was then submitted to the jury, which deliberated for a little over an hour before it convicted Barbour on the DUI, suspended license, and improper lane travel charges. It acquitted Barbour on the speeding count.

## ISSUES AND STANDARD OF REVIEW

¶11    Barbour appeals his DUI conviction, arguing that Counsel rendered ineffective assistance in (1) not moving to suppress the result of the breath test and (2) either not objecting to the prosecutor's statement that Deputy had complied with *Baker* or not playing for the jury the portion of the bodycam video corroborating Barbour's testimony that he had been biting his fingernails during the pretest observation period.[6] "Where, as

---

not evidence."). And Barbour did not introduce any evidence that he was a painter or that he had been working on the day of the incident or on the days before. Nonetheless, Barbour can be heard in dashcam footage captured while he was in the back of the police car saying that he was a painter. That footage does not appear to have been played for the jury.

6. Barbour also moves for remand under rule 23B of the Utah Rules of Appellate Procedure to supplement the record with evidence of Counsel's "reasons for not introducing evidence of

(continued…)

here, a defendant raises an ineffective assistance claim for the first time on appeal, we decide it as a matter of law." *State v. Perez*, 2026 UT App 57, ¶ 9, 590 P.3d 688 (cleaned up), *cert. denied*, June 9, 2026 (No. 20260556).

ANALYSIS

¶12 Barbour argues that Counsel was ineffective in not moving to suppress the result of the breath test because Deputy failed to restart the *Baker* clock despite the fact that Barbour had been actively biting his fingernails during the observation period. Relatedly, Barbour argues that Counsel was ineffective in failing to object to the prosecutor's statement in closing that Deputy complied with *Baker* or to otherwise play the video of Barbour chewing his nails. As set forth below, we agree with Barbour's first argument and conclude that Counsel provided constitutionally ineffective assistance in this case. We therefore need not address Barbour's second argument.

¶13 Demonstrating ineffective assistance requires a defendant to "show that (1) counsel's performance was objectively deficient and (2) the deficient performance resulted in prejudice." *West Valley City v. Drawn*, 2025 UT App 198, ¶ 15, 583 P.3d 1129 (cleaned up). To show deficient performance, "a defendant must establish that counsel's representation was not within the wide range of reasonable professional assistance." *State v. Barlow*, 2025 UT App 152, ¶ 26, 579 P.3d 422 (cleaned up). On this point, the "ultimate question" we must always answer is "whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *Id.* (cleaned up). Moreover, lawyers are entitled to pick their battles and are not obligated "to

---

the video supporting the *Baker* violation at trial." Because we determine that Counsel rendered ineffective assistance in the proceedings below, we need not consider the rule 23B motion. That motion is therefore moot.

correct every error that might have occurred at trial, regardless of whether it affected the defendant." *State v. Ray*, 2020 UT 12, ¶ 32, 469 P.3d 871. Instead, we must assess whether correcting an error at trial "was sufficiently important under the circumstances that failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought." *Id.*

¶14 Establishing prejudice requires a defendant to "demonstrate a reasonable probability that but for counsel's errors, the result would have been different." *State v. Perez*, 2026 UT App 57, ¶ 11, 590 P.3d 688 (cleaned up), *cert. denied*, June 9, 2026 (No. 20260556). A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). In considering a defendant's prejudice argument, we "consider the counterfactual universe in which the trial proceeded without the asserted errors and ask whether it is reasonably likely that a different result would have obtained but for those errors." *Perez*, 2026 UT App 57, ¶ 11.

¶15 To introduce the results of an Intoxilyzer breath test as evidence, the government must make a threshold showing that (1) a "trained technician" properly checked the Intoxilyzer machine and confirmed that it "was in proper working condition at the time of the test," (2) a "qualified operator" administered the test "correctly," and (3) "a police officer observed the defendant during the fifteen minutes immediately preceding the test to ensure that the defendant introduced nothing into his or her mouth during that time." *State v. Vialpando*, 2004 UT App 95, ¶ 14, 89 P.3d 209. Regarding the third element—which is at issue in this case—the government must show that (1) the defendant was "in the officer's presence" for the entire fifteen-minute observation period, (2) the defendant had no clear "opportunity to ingest or regurgitate anything" during that period, and (3) the officer's ability to observe the defendant during the period had not been impeded by anything. *Id.* ¶ 18.

¶16 Barbour asserts that the City failed to meet the foundational requirements to introduce the breath test evidence under *Baker* because his fingernails were something that he introduced into his mouth and Deputy failed to restart the fifteen-minute observation clock after Barbour did so. Our courts have not addressed whether *Baker* requires the clock to restart when defendants chew their fingernails during the observation period, and the parties do not point us to any non-Utah cases on the issue. However, based on a straightforward application of *Baker* and its Utah progeny, Barbour has established that Counsel was ineffective in failing to object to the breath test evidence.

¶17 Regarding deficient performance, the bodycam footage shows Barbour biting his nails consistently for two straight minutes during the observation period. We have watched the video and would characterize this as no mere nibble, but rather prolonged gnawing. Utah law makes clear that if the subject of a breath test has placed *anything* into his or her mouth during this time, the administering officer must restart the observation clock. *See, e.g.*, *Vialpando*, 2004 UT App 95, ¶ 14 (requiring the government to make a threshold showing that "a police officer observed the defendant during the fifteen minutes immediately preceding the test to ensure that the defendant introduced *nothing* into his or her mouth during that time" before an Intoxilyzer result can be admitted at trial (emphasis added)). For these reasons, Barbour is correct that his fingernails were something— i.e., not "nothing," *see id.*—that he introduced into his mouth during the pretest period. Therefore, Deputy was required to restart the fifteen-minute *Baker* clock.

¶18 Against this backdrop, it was objectively unreasonable for Counsel not to object to the admission of the breath test evidence. Where Barbour's only realistic possibility of acquittal on the DUI charge was exclusion of the breath test, Counsel had no reason not to move to suppress the evidence. The worst-case scenario for the defense had the court not granted such a motion would have been conviction, or what happened anyway. Therefore, moving to

suppress the breath test was "a battle that competent counsel would have fought" in this case. *See Ray*, 2020 UT 12, ¶ 32.[7]

¶19 The City resists this conclusion, arguing that a motion to suppress would have been futile because Deputy complied with *Baker* when he administered the breath test. It's true that a showing of deficient performance cannot be predicated on a failure to bring a futile motion. *See, e.g.*, *State v. Peterson*, 2020 UT App 47, ¶ 18, 462 P.3d 421. But for reasons we have already explained, *see supra* ¶ 17, the City is mistaken in its argument that Deputy complied with *Baker*. Again, Barbour introduced something into his mouth for approximately two consecutive minutes during the observation period, and it is plausible that he ingested something when he did so. Therefore, the City's argument that Counsel's performance on this issue was objectively reasonable falls well short of the mark.

¶20 On the prejudice prong, Barbour points to the DUI statute to argue that, without the breath test evidence, there is a reasonable probability that he would not have been convicted. Under the statute,

> An actor commits driving under the influence if the actor operates or is in actual physical control of a vehicle within this state if the actor:

---

7. Frequently, the reasonableness of a lawyer's decision not to object or make a motion has to do with how the action could affect the jury. *See, e.g.*, *West Valley City v. Drawn*, 2025 UT App 198, ¶ 25, 583 P.3d 1129 (describing the "pink-elephant paradox," a phenomenon that can arise when jurors think about the thing they are specifically told not to think about (cleaned up)). Fighting the battle of suppressing the breath test would not have implicated that issue here, however, because Counsel could have and should have filed a motion to suppress outside of the jury's presence prior to trial.

> (a) has sufficient alcohol in the actor's body that a subsequent chemical test shows that the actor has a blood or breath alcohol concentration of .05 grams or greater at the time of the test;
>
> (b) is under the influence of alcohol, any drug, or the combined influence of alcohol and any drug to a degree that renders the actor incapable of safely operating a vehicle; or
>
> (c) has a blood or breath alcohol concentration of .05 grams or greater at the time of operation or actual physical control.

Utah Code § 41-6a-502(1). Without the breath test, the City could not have used either subsection (a) or subsection (c) to convict Barbour in this case.

¶21 This leaves subsection (b), which required the City to show that Barbour was under the influence of alcohol such that he was unable to safely operate his vehicle. Assuming the breath test had been suppressed, the evidence to support a conviction under subsection (b) was (1) Barbour's admission that he had two beers and two shots on the night of the incident, (2) evidence that officers smelled alcohol on his breath after the initial stop, (3) Deputy's testimony about how Barbour had been driving before the traffic stop, and (4) the clues of impairment from the FSTs. Barbour invokes *State v. Harvey*, 2019 UT App 108, 446 P.3d 125, to argue that there is a reasonable probability that, absent the breath test evidence, he would not have been convicted under subsection (b). On this evidence, we agree with Barbour.

¶22 In *Harvey*, the defendant was driving at night with his lights off when he was pulled over. *Id.* ¶ 2. During the stop, the officer smelled "a strong odor of an alcoholic beverage emanating

from the vehicle," "saw a passenger attempting to hide a half-consumed bottle of vodka," and noticed that one of the defendant's eyes "appeared to be glassy and bloodshot." *Id.* ¶ 3 (cleaned up). The officer then administered three FSTs, and the defendant failed two of them. *Id.* ¶¶ 5–6, 26. The defendant declined a breath test, so the officer got a warrant for a blood draw. *Id.* ¶ 6. The defendant's blood "was subjected to two identical tests—a screening test and a confirmation test—with each test producing two results." *Id.* The screening tests showed BACs of .075 and .076, and the confirmation tests both showed BACs of .081.[8] *Id.* The defendant was then charged with DUI. *Id.* ¶ 7.

¶23 Over the defendant's objection at trial, the district court allowed a police officer to testify, "based on information he [had] received in his police training, about the human body's average rate of elimination of alcohol—the 'burn-off rate.'" *Id.* ¶ 1. The defendant was convicted of DUI and filed a motion for a new trial, arguing that the police officer improperly "gave expert testimony as a lay witness" about alcohol burn-off rates. *Id.* The court denied the motion. *Id.*

¶24 On appeal, we concluded that the court should have suppressed the officer's testimony. *See id.* ¶ 20. Because the practical effect of this holding was a determination that the question of defendant's potential violation of subsection (c) of the statute should not have gone to the jury, we turned to whether there was enough evidence apart from the officer's testimony to establish that the defendant "was incapable of safely operating a

---

8. When the defendant in *Harvey* was charged, the government had to prove that he had a BAC level of at least .08 to secure a conviction under either subsection (a) or (c). *See State v. Harvey*, 2019 UT App 108, ¶ 7, 446 P.3d 125. The DUI statute has since been amended to reduce the threshold to .05 for both provisions. *Compare* Utah Code § 41-6a-502(1)(a), (c) (2026), *with id.* § 41-6a-502(1)(a), (c) (2016).

vehicle" under subsection (b). *See id.* ¶ 22. We identified three cases where a driver had been convicted of DUI under that provision, and the common thread in each was "the presence of some evidence of the driver's incapacity to operate the vehicle safely." *Id.* ¶ 23. We included parenthetical explanations in which we highlighted the evidence that sufficed to support a conviction under subsection (b).

- In one case, the defendant (1) created "a traffic hazard by driving considerably below the speed limit," (2) was not responsive to an officer's attempts to pull her over, (3) performed poorly on FSTs, (4) maintained "an intent focus straight ahead" during the stop, (5) had "very droopy eyelids," and (6) was confused about why she was stopped. *See id.* (cleaned up) (citing *State v. Salgado*, 2018 UT App 139, ¶¶ 33–35, 37, 427 P.3d 1228).

- In another case, the defendant (1) slurred his speech and had glazed eyes, (2) had been incoherent and unsteady, (3) was unable to "control his actions" and demonstrated "impaired judgment," and (4) exhibited "boisterous behavior before driving." *See id.* (cleaned up) (citing *State v. Van Dyke*, 2009 UT App 369, ¶¶ 12–13, 15, 36–37, 223 P.3d 465).

- In a third case, the defendant (1) had the "odor of alcohol" on his breath, (2) performed poorly on three FSTs, (3) admitted that "he had consumed two or three beers," (4) "sway[ed] during and between [the] FSTs," (5) showed "difficulty in maintaining his balance," and (6) had been "chatt[y]." *See id.* (citing *Rosengreen v. State, Dep't of Public Safety*, 2003 UT App 183U, para. 5).

¶25    Applying those cases, we concluded that the non-BAC evidence was not enough to affirm the defendant's conviction under subsection (b). *See id.* ¶¶ 24–29. Among other things, the defendant had not been driving erratically, had not been slurring

his speech when he was stopped, had kept his balance when he got out of the car, and had not struggled to comply with the officer's orders regarding the FSTs. *Id.* ¶ 24. And while the defendant had undeniably been drinking before he was pulled over, the circumstances did not indicate that he was so impaired as to be incapable of safely operating a vehicle. *Id.* ¶ 25. Finally, the defendant's failing two of the three FSTs could not support affirmance under subsection (b). *Id.* ¶ 26. Regarding the defendant's failed horizontal gaze nystagmus test, we explained that it merely showed that he had alcohol in his system—not that he was incapable of driving safely—because the defendant passed the vertical gaze nystagmus test. *Id.* The combined effect of these two tests demonstrated that the defendant had been drinking but that, "at the very most," there was not a significant amount of alcohol present in his system. *Id.* Finally, we concluded that it was entirely possible that the defendant failed the walk-and-turn test not because he had been drinking but because he had previously suffered serious injuries to both legs—namely, a shark bite and a bullet wound. *Id.* ¶ 27. For these reasons, we determined that the evidence of the defendant's impairment was "weak" and found a reasonable likelihood that the jury would not have convicted had the officer's improper testimony been excluded at trial. *Id.* ¶ 29.

¶26 We come to a similar conclusion here. While the left side of Barbour's car crossed into the median, it did so only once and only briefly. A jury could hardly be faulted were it to determine that this did not create a traffic hazard. *See id.* ¶ 23. Moreover, Barbour pulled over shortly after Deputy activated his siren, and during the initial encounter, Deputy did not smell alcohol on Barbour's breath. Nor was there testimony at trial that Barbour had slurred his speech, had droopy eyelids, had been moving lethargically, or otherwise could not control his actions or maintain his balance during the traffic stop. And while Deputy noted that Barbour had exhibited some clues of impairment during the FSTs, Deputy did not testify at trial what those clues were. *See id.* ¶¶ 26–28 (holding that evidence of the defendant's failed FSTs, "standing alone,"

was insufficient to support a conviction under subsection (b) because it showed only that the defendant had consumed alcohol and because FSTs are generally understood to estimate BAC, "not the degree of incapacity"). Nor, for that matter, did the City grapple with how the evidence of Barbour's need to use the bathroom may have affected his performance on the FSTs. Finally, Barbour admitted to consuming two beers and two shots on the night of the stop. But *Harvey* all but states that a defendant's drinking prior to being pulled over, standing alone, is not enough to convict under subsection (b). *See id.* ¶ 25. Indeed, without far more evidence about when the drinks were consumed and other biological factors not in evidence here, the mere fact of having consumed alcohol at some point establishes neither blood alcohol level nor impairment. Under these circumstances, we conclude that there was a reasonable probability of a different result had the breath test evidence been excluded at trial.

¶27 For these reasons, Barbour has met his burden to demonstrate that he was deprived of constitutionally effective assistance of counsel and is entitled to a new trial.

CONCLUSION

¶28 Counsel performed deficiently by not moving to suppress the breath test evidence in this case because Barbour's fingernails were something that he placed into his mouth during the *Baker* pretest observation period. And because Counsel's failure to make a motion to address this issue was prejudicial to the defense, Barbour has demonstrated that he was deprived of effective assistance in the proceedings below. We therefore reverse his DUI conviction and remand the matter to the district court for a new trial on the charge.

_____